## MATTER OF PATEL

### In Exclusion Proceedings

A-70442716

*Decided by Board August 9, 1991*

(1) Aliens seeking admission to the United States who do not appear to an immigration inspector to be clearly and beyond a doubt entitled to enter are placed in exclusion proceedings under section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1988).

(2) Aliens who have effected an entry into the United States may only be removed in deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (1988).

(3) "Entry" is defined at section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession."

(4) The Board of Immigration Appeals has formulated a more precise definition of "entry" which requires (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

(5) An applicant for admission to the United States, whose passport is stamped "Admitted" by an immigration inspector but who is prevented from entering the main terminal of an airport by a customs officer who suspects the passport to be fraudulent, is properly placed in exclusion proceedings because the applicant is not "free from official restraint," as required by *Matter of Pierre*, 14 I&N Dec. 467 (BIA 1973). *Matter of V-Q-*, 9 I&N Dec. 78 (BIA 1960), clarified.

EXCLUDABLE: Act of 1952—Sec. 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Fraud or willful misrepresentation of a material fact

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

ON BEHALF OF APPLICANT:
Herbert Gee, Esquire
5847 San Felipe, Suite 2950
Houston, Texas 77057

ON BEHALF OF SERVICE:
Kimberly J. Barton
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Dissenting Opinion: Heilman, Board Member.

At the conclusion of an exclusion hearing conducted on November

16, 1990,[1] an immigration judge found the applicant excludable under section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(19) (1988), as an alien who had sought to enter the United States by fraud, and under section 212(a)(20) of the Act, as an immigrant not in possession of a valid unexpired immigrant visa. The applicant appealed from the immigration judge's decision and requested oral argument before the Board of Immigration Appeals.[2] The record will be remanded for further proceedings. The applicant's request for oral argument is denied.

While the factual record before us is incomplete, the underlying basis for the immigration judge's determination of excludability is not in dispute. The applicant is a male of indeterminate identity. He arrived in the Houston Intercontinental Airport on September 7, 1990, and presented an Indian passport and an Employment Authorization Card (Form I-688A) to the immigration inspector. The immigration inspector processed the applicant and stamped his passport: "ADMIT- TED, SEP 07 1990, CLASS: I-688A." The applicant was not referred to secondary inspection and proceeded directly to customs for an inspection of his baggage and personal effects.

In the customs area of the airport, the applicant presented his passport and customs form to the customs officer. Finding the applicant's passport suspicious, the customs officer returned the applicant to the immigration section to verify his documentation. A computer check revealed the applicant's passport to be a fraudulent one, and he was accordingly served with a Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I- 122) and placed in exclusion proceedings.

At an exclusion hearing conducted on September 28, 1990, the applicant claimed that he had "entered" the United States, as that term is defined for the purposes of the immigration laws, and should therefore have been placed in deportation proceedings. The immigra- tion judge continued the proceedings to allow the parties to submit briefs in support of their respective positions. At the reconvened hearing, the immigration judge determined that the applicant was properly in exclusion rather than deportation proceedings based on *Correa v. Thornburgh*, 901 F.2d 1166 (2d Cir. 1990), a recent decision that arose out of events that took place at the same Houston airport in 1982. In that case, the United States Court of Appeals for the Second

---

[1] The record contains the immigration judge's subsequent memorandum decision, dated February 11, 1991, which articulates the basis for his determination.

[2] Upon motion of the Immigration and Naturalization Service, which was not opposed by the applicant, the record of proceedings was forwarded to this Board without a transcript for an expedited decision.

Circuit found that an alien who had been inspected and admitted by an immigration officer but was later apprehended with a concealed controlled substance in the customs area of the airport had not "entered" the United States within the contemplation of the immigration laws. The sole issue before us in the present case is whether the applicant is properly in exclusion proceedings.

Aliens seeking admission who do not appear to an immigration officer to be clearly and beyond a doubt entitled to enter the United States are placed in exclusion proceedings under section 235(b) of the Act, 8 U.S.C. § 1225(b) (1988). On the other hand, aliens who have effected an entry into the United States may only be removed in deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (1988). Resolution of this case thus requires a determination of whether the applicant "entered" the United States as that term is defined under the immigration laws.

Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), generally defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." This Board has fashioned a more precise definition of entry, requiring: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. *Matter of Ching and Chen*, 19 I&N Dec. 203, 205 (BIA 1984) (citing *Matter of Pierre*, 14 I&N Dec. 467, 468 (BIA 1973)); *see also Matter of Yam*, 16 I&N Dec. 535 (BIA 1978); *Matter of Loulos*, 16 I&N Dec. 34 (BIA 1976).

In *Correa v. Thornburgh, supra*, the Second Circuit initially described the inspection and admission procedures at Houston Intercontinental Airport in 1982 as follows:

> At the Houston airport, all processing at that time of arriving international passengers for customs, agriculture and immigration purposes was conducted in a restricted area closed to the general public commonly referred to as the "Customs Enclosure." . . .

> Each incoming passenger was initially processed at a primary inspection station by a single Customs or INS inspector, who was cross-designated in order to act for both agencies. After preliminary questioning, the primary inspector would refer the passenger to a "red area" within the "Customs Enclosure" for a more intensive inspection, or to a "green area" still within the "Customs Enclosure." "Green area" referrals were permitted to proceed to the exit control station but were still subject to random selection for the more intensive "red area" inspection. The final stage in the inspection process occurred at the point of exit when the passenger presented the Customs declaration to the exit control officer. The exit control officer could either accept the declaration and permit the passenger to depart the "Customs Enclosure," or direct the passenger to the "red area" for further inspection.

*Id.* at 1168 (footnote omitted).

The court went on to describe the circumstances following Ms. Correa's arrival at the airport following an international flight. A customs officer, acting that day on a "cross-designated" basis as an immigration inspector at one primary inspection station noticed Ms. Correa, who was standing in line at another primary inspection station, and suspected her of being a drug courier. Although she successfully passed through primary inspection, officers of the United States Department of Agriculture operating in the customs area prevented Ms. Correa from proceeding to the exit control station and referred her to an area designated for "secondary inspection." After an agricultural inspection in that area, the customs officer who initially observed Ms. Correa searched her luggage and discovered a large amount of cocaine. The Immigration and Naturalization Service subsequently sought to exclude her under section 212(a)(23) of the Act, as an alien who an "immigration officer knows or has reason to believe" is or has been an illicit trafficker in controlled substances.

Ms. Correa contended that she had effected an "entry" into the United States when she was permitted to pass through the primary inspection station at the Houston airport and maintained that she consequently was improperly in exclusion proceedings. She cited our decision in *Matter of V-Q-,* 9 I&N Dec. 78 (BIA 1960), in support of her claim. The alien in that case, after inspection by an immigration official at the Santa Fe Street Bridge inspection station in El Paso, Texas, was told to "go ahead." When the alien had proceeded some 75 feet past the immigration inspection point, a bystander notified the inspecting officer that the alien was a prostitute. The immigration officer then apprehended the alien for further inspection, which this Board held could be conducted only in deportation proceedings.

The Second Circuit, however, applying our caselaw as synthesized in *Matter of Pierre, supra,* found that Ms. Correa had not effected an "entry." The court concluded that it was clear that she had never satisfied the third prong of the *Pierre* test, i.e., "freedom from official restraint." From her arrival in the United States to the moment of her arrest, she "remained in a restricted area, known as the 'Customs Enclosure', where access and egress were controlled by exit control officers, and by Customs, Immigration, and USDA officers assigned to the area." *Correa v. Thornburgh, supra,* at 1172 (footnote omitted). If she had attempted to leave, she would have been prevented from doing so. Thus, Ms. Correa was "never free to physically enter the United States or to go at large and mix with the general population." *Id.* The court distinguished *Matter of V-Q-, supra,* on the factual ground that the alien in that case, after completing an inspection, had been told to "go ahead" and had proceeded beyond the inspection point. The court

noted our conclusion in *Matter of V-Q-* that, since the inspector had lost custody over the alien, an entry had occurred, necessitating deportation proceedings. In Ms. Correa's case, however, "custody was never lost" and she was never free from official restraint. *Correa v. Thornburgh, supra,* at 1172.

We have reviewed *Matter of V-Q-* in light of the applicant's arguments in the instant case and the decision of the Second Circuit in *Correa v. Thornburgh.* In *Matter of V-Q-, supra,* at 79, we stated that jurisdiction to hold and exclude the alien terminated because the question of her right to be admitted as a returning resident had been resolved in her favor "and she was no longer in the custody of the immigration officer." We found support for our decision in an unreported case in which an alien had been placed in deportation proceedings "after he had progressed not more than six or eight feet from the point where an immigrant inspector had 'admitted' him as a United States citizen." *Id. Matter of V-Q-,* however, also contains the following language:

> "Admission" occurs when an authorized employee of the Service communicates in a tangible manner to an applicant for admission his determination that the applicant has established that he is not inadmissible under the immigration laws. At the point such communication is made and received by the applicant, "admission" has occurred.... Once "admission" has occurred, our holding is that exclusion proceedings are no longer proper and that expulsion proceedings are required.

*Id.* at 79-80. This aspect of the decision makes no reference to the alien being "no longer in the custody of the immigration officer." *Id.* at 79. And, unless read within the factual context of the case, this language differs from the holding in *Matter of Pierre, supra,* which delineates the threshold between exclusion and deportation proceedings at an alien's "entry" into the United States which in turn requires both "inspection and admission" *and* "freedom from official restraint." *Id.* at 468.

If *Matter of V-Q-* is read as omitting the requirement that an alien be free from official restraint before deportation proceedings are mandated, a disparate outcome obviously could result in certain kinds of cases. For example, in the case of aliens such as the one in *Matter of V-Q-,* "admission" and "entry" converge: i.e., once the immigration inspector communicates his favorable determination of her "admissibility," the alien is free to proceed into the United States. She therefore effects an "entry" inasmuch as she is "free from official restraint" immediately following inspection. Under the facts in *Correa v. Thornburgh,* however, a gap separates the immigration inspector's communication of his determination that the alien is "admissible" (by stamping her passport) and the moment the alien is free to exit the restricted area and "enter" the United States. For aliens at this point between the immigration inspection point and the exit control station,

372

*Matter of Pierre* would indicate that exclusion proceedings are required, since such aliens have not effected an "entry" as they are not yet free from official restraint. On the other hand, if we were to apply *Matter of V-Q-*, as that case is interpreted by the applicant herein, aliens similarly situated would instead find themselves in deportation proceedings, as the boundary would be drawn at the earlier point when their admissibility was favorably determined and that determination was communicated to them by an immigration inspector.[3]

Given the possible contradictory results in the application of these two cases, we note that *Matter of Pierre* and its progeny were decided after, and thereby supersede, *Matter of V-Q-*. In any event, we now clarify that *Matter of V-Q-* should not be read as requiring that an alien who has been inspected and admitted, but who has not yet been freed from official restraint, be placed in deportation rather than exclusion proceedings.[4] Reading *Matter of V-Q-* to hold that freedom from official restraint is not an essential element to effecting an entry into the United States would be inconsistent with decades of caselaw on the "entry" issue, including the very cases relied upon in *Matter of V-Q-*. *See United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954); *United States ex rel. Patton v. Tod*, 297 Fed. 385, 396 (2d Cir. 1924); *United States v. Lazarescu*, 104 F. Supp. 771, 777 (D.C. Md.), *aff'd*,

---

[3] The Service acknowledged in its brief before the immigration judge that it had in the past followed unspecified "caselaw" and placed aliens who were inspected and admitted by an immigration inspector in deportation proceedings, notwithstanding the fact that such aliens were not permitted to proceed past the customs area. Now, however, based on *Correa v. Thornburgh, supra,* the Service indicates that it is seeking the exclusion rather than the deportation of such aliens.

[4] Our determination finds further support in section 235(b) of the Act, which governs exclusion proceedings. That provision reads:

Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. *The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.* (Emphasis added.)

The statutory language here quoted indicates that *Matter of V-Q-* may have been wrongly decided in that it held a single immigration inspector's communication of his favorable determination of an alien's admissibility to be sufficient to require that all further adjudication of that issue be conducted in deportation proceedings. Section 235(b) of the Act clearly states that an alien is subject to exclusion proceedings until such time as the initial decision to admit the alien is no longer subject to challenge by another immigration inspector. We believe the requirement that an alien "enter" the United States "free from official restraint" before he or she will be placed in deportation proceedings, as set forth in *Matter of Pierre*, comports well with this statutory framework.

373

199 F.2d 898 (4th Cir. 1952). The critical point in such cases is that freedom from official restraint exists, not that such freedom has been exercised. *Compare, e.g., United States v. Vasilatos, supra* (entry occurred when a crewman was cleared by an immigration officer upon arrival in Philadelphia for a temporary stay in the United States even though the crewman did not exercise this freedom until physically landing at Baltimore), *with In Re Dubbiosi,* 191 F. Supp. 65, 66 (E.D. Va. 1961) (entry did not occur where a crewman was examined and given a landing permit but was not permitted to leave the ship pending the completion of a search for stowaways).

Applying our definition of "entry" as set forth in *Matter of Pierre* to the facts of the present case, we would find that this applicant has not yet "entered" the United States if the same inspection and admission procedures outlined by the Second Circuit in *Correa v. Thornburgh* are still in effect at Houston Intercontinental Airport. However, the record before us does not include evidence regarding the present inspection and admission procedures at that airport and there is no clear factual record before us upon which to resolve this issue. Accordingly, we will remand the record to the immigration judge to further consider the "entry" issue after submission of evidence regarding the alien's freedom (or lack thereof) from official restraint. In this respect, we note the following:

> "Freedom from official restraint" means that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. Although physical movement may evidence that such freedom has been acquired, it is not a necessary component as long as the alien is *free* physically to enter the United States openly or surreptitiously. Such restraint need not be by immigration officers. *Edmond v. Nelson,* 575 F. Supp. 532, 535 (E.D. La. 1983) (aliens seeking entry by sea "restrained" by master of rescuing ship, acting pursuant to government regulations); *Matter of Yam,* 16 I&N Dec. 535, 536-37 (BIA 1978) (alien found at border and taken under guard by local police to a medical facility).

*Correa v. Thornburgh, supra,* at 1172 (citations omitted).

**ORDER:** The record is remanded to the immigration judge for further proceedings.

*DISSENTING OPINION:* Michael J. Heilman, Board Member

I respectfully dissent.

The majority opinion relies very heavily on the issue of "restraint" in arriving at its conclusion. In my estimation, this reliance is incorrect, as this term has attained prominence through an incorrect reading of federal court decisions relating to crewmen. This term was applied to the specific context of prosecution of alien crewmen who had arrived in foreign vessels in United States waters after being

374

deported. The term was never used to describe the situation in a United States airport confronting an alien passenger who had disembarked from an aircraft, the situation we are dealing with here. The term "restraint" and the phrase "free from restraint" have no applicability here and should not be employed. I would dismiss the appeal as the applicant was properly in exclusion proceedings.

This Board's leading decision on the concept of "restraint" is *Matter of Pierre*, 14 I&N Dec. 467 (BIA 1973). There, a number of Haitian nationals had been passengers on a small boat, which had fallen into distress and had been towed into the port of West Palm Beach, Florida, by an American vessel. At that point, the captain of the American vessel kept them on board, as he had determined that they had no entry documents. The aliens contended that they had made an "entry" and so should have been placed in deportation, not exclusion proceedings. The exact argument the aliens made is not set forth in the decision, and it is not clear at what point they claimed they had entered, upon arrival at the port, or subsequently when they were "paroled" into the custody of several ministers of religion. The Board stated that although the aliens had "crossed into the territorial limits of the United States," they "remained on board and waited for the immigration inspectors to come to them." The Board concluded that they had not entered and were correctly in exclusion proceedings. *Id.* at 469-70.

This conclusion was based on the Board's interpretation of the term "entry," as only aliens who "enter" the United States are properly in deportation proceedings. As the Board stated:

> The courts have found it necessary to interpret the term "entry," which is now defined in section 101(a)(13) of the Act as "... any coming of an alien into the United States, from a foreign port or place or from an outlying possession...." A survey of the many cases which have treated this subject over the years leads to the following conclusion: An "entry" involves (1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer, *United States v. Vasilatos*, 209 F.2d 195 (C.A. 3, 1954); *Lazarescu v. United States*, 199 F.2d 898, 900 (C.A. 4, 1952); *or* (3) actual and intentional evasion of inspection at the nearest inspection point, *U.S. ex rel. Giacone v. Corsi*, 64 F.2d 18 (C.A. 2, 1933); *Morini v. United States*, 21 F.2d 1004 (C.A. 9, 1927), *cert. den.* 276 U.S. 623 (1928); *Lew Moy v. United States*, 237 Fed. 50, 52 (C.A. 8, 1916); *Matter of Estrada-Betancourt*, 12 I&N Dec. 191, 193-4 (BIA 1967); *Matter of Albuerne-Urquiza*, A17 334 264, unreported decision (BIA October 12, 1967); *coupled with* (4) freedom from restraint, *United States v. Vasilatos, supra*; *Lazarescu v. United States, supra*. In all of the above cases these conditions were satisfied and an entry was effected.

*Matter of Pierre, supra*, at 468.

For our purposes, it is important to note the context of the two decisions cited for the proposition that "freedom from restraint" is a prerequisite to "entry," *United States v. Vasilatos*, 209 F.2d 195 (3d

Cir. 1954), and *Lazarescu v. United States,* 199 F.2d 898 (4th Cir. 1952). These cases involved criminal prosecutions of previously deported aliens registered on crew lists as crewmen on vessels which had come to the United States from foreign territory. The discussion of "restraint" in those decisions occurred against the backdrop of the particular immigration laws applicable to crewmen and passengers. As the United States Court of Appeals for the Third Circuit stated in *Vasilatos*:

> It must have been apparent, long before the fact was emphasized in the 1952 definition, that in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation. But the actual clearance of persons who seek admission in regular course is accomplished at designated stations, many of them located as a matter of convenience some distance inside the national boundary. In these circumstances, those who have come from abroad directly to such a station seeking admission in regular course have not been viewed by the courts as accomplishing an "entry" by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission. The reasonableness of this concept is emphasized by the fact that the master of an incoming vessel is under a *legal duty to restrict passengers and crew members to the ship* pending immigration clearance....

> ... For that presence in the United States which is essential to entry existed when, and even before, the ship arrived in Philadelphia. No landing was necessary to supply that prerequisite. The other essential factor, freedom from restraint, came into existence when an immigration officer in Philadelphia cleared Vasilatos for a temporary stay in the United States.

*United States v. Vasilatos, supra,* at 197 (emphasis added) (citations omitted).

This interpretation tracked that of *Lazarescu,* where the Court of Appeals for the Fourth Circuit stated: "The port and harbor of Baltimore is territory of the United States. Entry into that territory even in a vessel amounted to a violation of the act unless appellant was under restraint which prevented his departing from the vessel." *Lazarescu v. United States, supra,* at 900-01.

It is clear from the analysis provided in these two decisions that the "restraint" the courts were referring to was that imposed by the captains of the vessels. They were "under a legal duty to restrict passengers and crew members to the ship," as the court stated in *Vasilatos.*

It is clear that the Board understood this to be the "restraint" it found in *Matter of Pierre, supra.* As the Board correctly noted, the captain "would have been subject to penalties if he had permitted them to land, sections 271 and 273, Immigration and Nationality Act." *Id.* at 469. Section 271 of the Immigration and Nationality Act, 8 U.S.C. § 1321 (1988), states in part:

376

(a) It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads, other than transportation lines which may enter into a contract as provided in section 238, bringing an alien to, or providing a means for an alien to come to, the United States (including an alien crewman whose case in not covered by section 254(a)) to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers. Any such person ... shall be liable to a penalty to be imposed by the Attorney General of $1,000 for each such violation ....[1]

This duty to detain on board is also stated in the immigration regulations:

(a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the master, commanding officer, purser, person in charge, agent, owner, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The Service will not be liable for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissability [sic] by a Service officer.

8 C.F.R. § 235.3(a) (1991).

The captain of the United States vessel which had towed the Haitian boat into United States territorial waters carried out this duty and did not allow the aliens to leave the ship. This is the "restraint" the Board was referring to, the same "restraint" discussed in *Vasilatos* and *Lazarescu.* This is not the "restraint" we are dealing with in this case. If we were considering the "restraint" imposed by the captain of the aircraft which had brought the alien to Houston, we would be correctly applying *Matter of Pierre* and the cases it surveys.

We are not. What we are considering is the entirely different situation where the captain of the aircraft has delivered the passengers to a designated port of entry, the passengers have been given permission to disembark from the aircraft, and they have left the aircraft and entered the airport proper. We are in fact at this point now considering a different form of "restraint," that exercised by immigration officers within the confines of the airport. Whatever that "restraint" might be, it is not the "restraint" considered to exist when a private party, under legal obligation, prevents the departure of a passenger or crewman from a vessel or aircraft. We are already well past that point in this situation.

The majority's decision simply treats these two different forms of "restraint" as the same issue. The majority wrongly employs prior

---

[1] Section 271 of the Act was revised by section 543(a)(8) of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5058, to increase the amount of the penalty imposed for each violation from $1,000 to $3,000.

court and Board decisions as authority for its interpretation of "entry" in this case.

The situation that we are dealing with in this instance is covered by the provisions of section 235 of the Act, 8 U.S.C. § 1225 (1988), which governs the immigration inspection of aliens seeking admission to the United States. In pertinent part that section states:

> (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. . . .

> (b) Every alien (other than an alien crewman) and except as otherwise provided . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

The situation we are considering is that where the passengers have been delivered by the carrier to the inspection station and they are free of carrier restraint. At this point, we are considering the authority of the immigration officer under this section of the Act, not the obligation of the carrier. As an initial matter, it is clear that the term "restraint" does not appear in this provision. There is a simple requirement for "examination" of the arriving alien on such matters as the purpose of the visit, the anticipated length of stay, and if the individual is an alien, "whether he belongs to any of the excluded classes enumerated in section 212" of the Act. Section 235(b) of the Act. If the alien does not "appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land," then the alien "shall be detained for further inquiry to be conducted by a special inquiry officer." *Id.*

It is in these words that we discover the authority of the immigration officer to "restrain" persons, as the immigration officer is obligated to prevent the alien's admission by detaining him. It is also clear from the language of section 235(b) of the Act that Congress intended this authority to be broadly available to all immigration officers at the port of entry, not just the first immigration officer who may have examined the alien, and who may in fact have decided to admit the alien. This is evident from the language in which Congress stated that even if an examining officer's decision is "favorable to the admission" of the alien, that decision "shall be subject to challenge by

378

any other immigration officer and such challenge shall operate" to force the alien to appear before a special inquiry officer. *Id.*

This "challenge" feature of section 235(b) of the Act is also found in section 204(e) of the Act, 8 U.S.C. § 1154(e) (1988), which specifically states that approval of an immigrant visa petition does not entitle an alien to enter the United States if the inspecting immigration officer finds the individual "not to be entitled" to his visa classification. The same situation pertains with an alien who has obtained a nonimmigrant visa from a consular officer. That person is also subject to exclusion at the port of entry by an immigration officer. Section 221(h) of the Act, 8 U.S.C. § 1201(h) (1988).

While it is clear that an alien traveler or immigrant may be sorely inconvenienced by having his entry subject to challenge after having received a visa and having traveled to the United States, it is equally clear that this redundant authority to challenge an alien's entry is a cornerstone of the immigration control process. A person seeking a business visitor's visa at an American consulate may be subjected to a lengthy interview and be required to provide documentary evidence of ties to his native country. After satisfying the consular officer and being granted the visa, he may still be barred from entry upon arrival.

Section 235(b) adds another layer to this authority to challenge entry. In this instance, the authority is given to "any" immigration officer and may be exercised by, in effect, second-guessing a decision to admit, already made by a fellow immigration officer. One imagines that in practical terms this authority to challenge an initial decision to admit is normally carried out by a supervisory immigration inspector, or by an experienced inspector as against a junior or trainee officer. It may operate as simply as an immigration officer pointing out something that may have been overlooked in the initial inspection, even after the alien's passport has been stamped with an admission stamp and the individual has passed the initial inspecting officer. This all seems to be a matter of common sense. International flights disgorge several hundred passengers at a time, and the immigration inspectors are under pressure and instructions to inspect them as quickly as possible. Under these circumstances, judgments as to admissibility are made very quickly, often in less than a minute, while the immigration inspector flips through a passport handed to the inspector by the passenger. In this context there is a premium on speed, but also on not being bound by mistake or misjudgment. That is why a decision to admit is subject to challenge by "any other immigration officer."

As this is so, it appears to me that the only issue in this appeal is whether this "challenge" occurred pursuant to section 235(b) of the Act, when, following the decision of the first inspecting officer to

379

admit the alien, a customs officer subsequently discovered that the individual's passport had been altered. The customs officer brought this matter to the attention of the Immigration and Naturalization Service, which then placed this individual in exclusion proceedings before an immigration judge. Presumptively, this "challenge" fell within section 235(b) of the Act. This is so because there is nothing to indicate that the customs officer was not authorized to do what he did, examine the passport and bring its fraudulent nature to the attention of the Service. I assume that if this was not an accepted practice, the Service would not have taken any action when the alteration was pointed out.

For purposes of this appeal, I would assume that once this highly material fact was brought to the attention of the immigration inspector, he "challenged" his own decision. Surely, well within the scope of the term "challenge" is the entirely mundane act of pointing out for the inspecting officer's edification and action a piece of crucial information which has been overlooked in the press of business. If this is done by a fellow immigration officer so much the better, but there is no reason it cannot be done by a customs officer or even a fellow passenger who has seen or overheard something suspicious which he brings to the inspecting officer's attention.

To require this "challenge" to occur before the decision to admit is made, and before the passport is stamped, would effectively do away with the "challenge" provisions of section 235(b) of the Act. It would require the would-be challenger to anticipate the decision and leap into action before the admission stamp could touch a page in the passport. This provision authorizes any immigration officer to challenge the "decision" to admit, and this authority is clearly not negated just because the passport has been marked with an admission stamp. The effect of the "challenge" is to nullify the stamp in the passport, not vice versa.

Here, the alien applicant for admission does not assert that the customs officer's action was improper or without authority, as he cannot. He can only argue that the decision of the inspecting immigration officer could not be reversed, even by the officer himself. But this argument runs directly counter to the abundantly clear language of section 235(b) of the Act. Surely, "challenge" does not mean that a duel with seconds was required before the inspecting officer could consider the information provided to him by the customs officer, come to the entirely reasonable conclusion that he may have made a mistake, and withdraw his decision to admit. Surely, implicit in the word "challenge" is a discussion in civilized discourse which results in a change in the decision. I imagine that in the normal course of events at an inspection station supervisory inspectors often

"challenge" decisions by subordinates, who change their mind, and that in any event, the supervisor's decision controls, whether the subordinate agrees or not. When an alien is brought before the immigration judge under this provision, the admitting officer and the "challenger" do not argue about their decisions to admit or to bar admission. In every case, as the law makes crystal clear, it is only the adverse decision of an immigration officer, the decision to deny admission, that is considered by the immigration judge.

It is abundantly clear in these circumstances that once the customs officer brought to the inspecting immigration officer the information that the passport was fraudulent, the immigration officer was free under section 235(b) of the Act to withdraw his decision to admit, to override, to "challenge" his own decision, and to detain the applicant for a hearing before an immigration judge. For these reasons, I would find that the applicant was not admitted to the United States when the stamp was placed in his passport, and so he was properly in exclusion proceedings. I would therefore dismiss the appeal.